UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| MARTIN SALAZAR CASTRO, | Case No. 2:16-cv-01237-MMD-EJY |
| Petitioner, | ORDER |
| v. | |
| RENEE BAKER, *et al.*, | |
| Respondents. | |

## I.    SUMMARY

Petitioner Martin Salazar Castro filed a petition for writ of habeas corpus ("Petition") (ECF No. 7) under 28 U.S.C. § 2254. This matter is before the Court for adjudication on the merits. For the reasons discussed below, the Court denies the Petition and grants him a certificate of appealability for Ground Five only.

## II.    BACKGROUND

Castro's convictions are the result of events that occurred in Clark County, Nevada on January 31, 2008. (ECF No. 14-16 at 3.) In its order affirming Castro's convictions, the Nevada Supreme Court described the crimes, as revealed by the evidence at Castro's trial, as follows:

> Appellant Martin Castro, along with Courtney Collins, entered a house in which two females, C.B. and J.T., and two males, N.M. and D.W., were present. Castro and Collins had shotguns, and threatened the four victims. The victims testified that Castro forced them to the ground, stole property from D.W. and J.T., groped C.B. and J.T., and penetrated C.B.'s and J.T.'s vaginas digitally and with shotguns.
>
> A struggled ensued when the victims fought against Castro and Collins, and during the fighting, Castro was shot. He was hospitalized in the Intensive

///

Care Unit (ICU) of the University Medical Center. Castro gave a statement to police while in custody there.

(ECF No. 16-14 at 3–4.)

On March 22, 2010, a jury convicted Castro of the following: one count of conspiracy to commit robbery; one count of burglary while in possession of a deadly weapon; four counts of first-degree kidnapping with the use of a deadly weapon; two counts of robbery with the use of a deadly weapon; one count of conspiracy to commit sexual assault; three counts of sexual assault with the use of a deadly weapon; one count of attempted sexual assault with the use of a deadly weapon; two counts of battery with intent to commit sexual assault with the use of a deadly weapon; four counts of battery with the use of a deadly weapon; and four counts of open or gross lewdness with the use of a deadly weapon. (ECF No. 16-4.) Castro appealed, and the Nevada Supreme Court affirmed the convictions on March 30, 2012. (ECF No. 16-14.) Remittitur issued on April 24, 2012. (ECF No. 16-15.)

Castro filed a state habeas corpus petition and a counseled, supplemental petition on August 1, 2012, and September 17, 2013, respectively. (ECF Nos. 16-16, 17-5.) The state district court denied the petition on April 28, 2014. (ECF No. 17-9.) The Nevada Supreme Court affirmed on December 18, 2015. (ECF No. 17-14.) Remittitur issued on January 12, 2016. (ECF No. 17-15.)

Castro dispatched his federal habeas corpus petition for filing on or about May 25, 2016. (ECF No. 7.) Respondents moved to dismiss parts of Ground Two of the Petition. (ECF No. 12.) Castro moved for a stay in order to exhaust the unexhausted grounds in the Petition. (ECF No. 18.) This Court found that Ground Two Part B and Ground Two Part C were unexhausted. (ECF No. 22 at 4.) This Court also determined that Castro's motion for a stay was premature and, as such, denied it without prejudice. (*Id.* at 5.) This Court ordered Castro to either abandon the unexhausted claim; return to state district court to exhaust his unexhausted claims, in which case the Petition would be denied without prejudice; or file a renewed motion for a stay. (*Id.* at 4–6.) Castro

chose to renew his motion for a stay. (ECF No. 27.) This Court denied Castro's motion and order Castro to either abandon the unexhausted grounds or dismiss the Petition without prejudice in order to return to state district court to exhaust his unexhausted claims. (*Id.* at 4.) Castro chose to abandon Ground Two Part B and Ground Two Part C. (ECF No. 31.)

Respondents answered the remaining grounds in the Petition on August 30, 2018. (ECF No. 32.) Castro did not reply.

In his remaining grounds for relief, Castro asserts the following violations of his federal constitutional rights:

> 1. His trial counsel was ineffective for failing to conduct a full and adequate cross-examination of the victims.
> 2A. His trial counsel was ineffective for failing to conduct a reasonable and adequate pretrial investigation regarding the criminal histories of the victims.
> 3. His trial counsel failed to object to the State's improper questions.
> 4. There were cumulative errors.
> 5. The state district court erred in admitting Castro's involuntary statements to the police.
> 6. The state district court erred in denying his motion for a new trial after a panel member implied that Castro was incarcerated.
> 7. There was insufficient evidence to support his convictions for sexual assaults, attempted sexual assault, conspiracy to commit sexual assault, or kidnapping.
> 8. The state district court erred by providing incorrect jury instructions and by rejecting his proposed jury instructions.

(ECF No. 7.)

## III.   LEGAL STANDARD

28 U.S.C. § 2254(d) sets forth the standard of review generally applicable in habeas corpus cases under the Antiterrorism and Effective Death Penalty Act ("AEDPA"):

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim --

3

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A state court decision is contrary to clearly established Supreme Court precedent, within the meaning of 28 U.S.C. § 2254, "if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court." *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000), and citing *Bell v. Cone*, 535 U.S. 685, 694 (2002)). A state court decision is an unreasonable application of clearly established Supreme Court precedent within the meaning of 28 U.S.C. § 2254(d) "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 75 (quoting *Williams*, 529 U.S. at 413). "The 'unreasonable application' clause requires the state court decision to be more than incorrect or erroneous. The state court's application of clearly established law must be objectively unreasonable." *Id.* (quoting *Williams*, 529 U.S. at 409–10) (internal citation omitted).

The Supreme Court has instructed that "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The Supreme Court has stated "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* at 102 (citing *Lockyer*, 538 U.S. at 75); *see also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (describing the standard as a "difficult to meet" and "highly deferential standard for evaluating state-court rulings,

///

4

1 which demands that state-court decisions be given the benefit of the doubt" (internal
2 quotation marks and citations omitted)).

3 **IV.    DISCUSSION**

4      The Petition asserts eight remaining grounds for relief. (ECF No. 7 at 7–50.) The
5 Court will address each ground in turn.

6      **A.    Ground Seven[1]**

7      In Ground Seven, Castro argues that there was insufficient evidence to support
8 his convictions for sexual assaults, attempted sexual assault, conspiracy to commit
9 sexual assault, and kidnapping. (ECF No. 7 at 40–41, 43.) With regard to the sexual
10 assault-based convictions, Castro asserts that the victims implicated his co-assailant,
11 Courtney Collins, not him. (*Id.* at 41.) In Castro's appeal of his judgment of conviction,
12 the Nevada Supreme Court held:

13      Castro also argues that there was insufficient evidence to support the
14      convictions of sexual assault with the use of a deadly weapon, attempted
         sexual assault with the use of a deadly weapon, and conspiracy to commit
15      sexual assault. When considering a sufficiency of the evidence challenge,
         we determine "'whether, after viewing the evidence in the light most
16      favorable to the prosecution, any rational [juror] could have found the
         essential elements of the crime beyond a reasonable doubt.'" *McNair v*
17      *State*, 108 Nev. 53, 56, 825 P.2d 571, 573 (1992) (quoting *Jackson v.*
         *Virginia*, 443 U.S. 307, 319 (1979)). The State presented the testimony of
18      all four victims and Castro's statement. This was enough evidence to allow
19      a rational juror to convict Castro on a theory of direct commission or as a
         co-conspirator.
20

21 (ECF No. 16-14 at 4 n.1.) With regard to the sufficiency of the evidence of the kidnapping
22 conviction, the Nevada Supreme Court held:

23      The standard that this court uses to review sufficiency of the evidence is
24      "'whether, after viewing the evidence in the light most favorable to the
         prosecution, any rational [juror] could have found the essential elements of
25      the crime beyond a reasonable doubt.'" *McNair v. State*, 10 Nev. 53, 56,
         825 P.2d 571, 573 (1992) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319
26      (1979)). The testimony at trial established that Castro's and Collins's actions
27      physically restrained the victims and that the risk of harm to the victims was

28      _____
       [1]Because Ground Seven contains the relevant facts of the underlying crime, it is
       discussed first in order to provide background information for the forthcoming grounds.

5

more than was required to complete the robbery and sexual assault. Thus, sufficient evidence supports the first-degree kidnapping convictions.

(*Id.* at 11.) These rulings were reasonable.

"[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). A federal habeas petitioner "faces a heavy burden when challenging the sufficiency of the evidence used to obtain a state conviction on federal due process grounds." *Juan H. v. Allen*, 408 F.3d 1262, 1274 (9th Cir. 2005). On direct review of a sufficiency of the evidence claim, a state court must determine whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The evidence is to be viewed "in the light most favorable to the prosecution." *See id.* Federal habeas relief is available only if the state-court determination that the evidence was sufficient to support a conviction was an "objectively unreasonable" application of *Jackson*. *See Juan H.*, 408 F.3d at 1275 n.13.

### 1.    Relevant Evidence

Janae Tigrett testified that on the evening of January 31, 2008, she went to her friend Caroline Batalon's house for a barbeque. (ECF No. 15-2 at 5–6.) Batalon lived with her boyfriend, Nasario Marquez, and Damian Wyzga, who were both also present at the residence on that evening. (*Id.* at 10.) As Batalon, Marquez, and Tigrett were preparing food in the kitchen and Wyzga was "com[ing] downstairs on his way out to work," Tigrett heard a loud bang and saw two men enter the residence with a shotgun. (*Id.* at 12–13.) Castro, one of the men who entered the residence, ordered everyone to get on the ground, pointed the gun at them, and asked where their money and marijuana were located. (*Id.* at 14–15, 17–19.) After Marquez told Castro that there was money upstairs, Castro ordered the other assailant, Collins, to go upstairs in search of the items. (*Id.* at 21.) While Collins was upstairs rummaging around, Castro watched over the four victims while wielding the shotgun and hit Tigrett in the face with the barrel of the

shotgun. (*Id.* at 23.) After he was unsuccessful in locating anything, Collins returned downstairs, and Castro went upstairs to search. (*Id.* at 24–25). While Castro was upstairs, Collins wielded the shotgun over the victims. (*Id.* at 25.) Castro did not find much upstairs and, upon returning downstairs, demanded the victims' cell phones and purses. (*Id.* at 27.) Castro stayed with the victims and ordered Collins to collect the items. (*Id.* at 32.)

Castro approached Tigrett to check her pockets, and, as he was doing so, he grabbed her breasts, pulled her "pants down halfway," and "grop[ed her] bottom." (*Id.* at 35–37.) Castro then "started touching [her] vagina. And then at one point, he inserted one of his fingers inside of [her]. And then he attempted to try and insert another finger into [her] vagina." (*Id.* at 37.) Castro then called Collins over, and Collins "also touched [her] vagina." (*Id.* at 38.) One of the assailants then "inserted the barrel of the gun into [Tigrett's] vagina," and one of the assailants took off her pants and shirt, straddled her, and unhooked her bra. (*Id.* at 39–40.) The assailants then "forced [Tigrett and Batalon] to turn over to lay on [their] backs," and Castro proceeded to get undressed. (*Id.* at 41–42.)

Before any further assault could take place, Wyzga had gotten ahold of Collins, Marquez started fighting Castro "over the gun," and Batalon started hitting Castro with a frying pan. (*Id.* at 43.) The shotgun got loose, and Tigrett recovered it. (*Id.* at 44–46.) Tigrett then shot Castro "somewhere in the lower area" and then when Castro lunged towards her, she shot Castro again "in the mid-section." (*Id.* at 46–47.) Tigrett entered the dining room where Wyzga and Collins were fighting, but Tigrett did not want to shoot Collins for fear of hitting Wyzga. (*Id.* at 47.)

Tigrett then went upstairs to find a shirt to cover herself, and when she came back downstairs, Collins was gone and Castro was "trying to get away, going down the driveway." (*Id.* at 49–50.) A neighbor called law enforcement, and the four victims got into a vehicle, drove around the block, and then came back to the house. (*Id.* at 52–53, 60.) When they got back to the house, Wyzga and Marquez exited the vehicle. (*Id.* at

7

60.) Tigrett then observed Collins exiting a vehicle that had just driven up, and Tigrett got into the drivers' seat of the vehicle and drove her and Batalon to Tigrett's grandmother's house nearby. (*Id.* at 62–63.) Batalon and Tigrett eventually went back to the house and spoke with law enforcement. (*Id.* at 69.)

Wyzga, who was called as a witness following Tigrett, testified that on January 31, 2008, he was "about to head out to work" while Marquez, Batalon, and Tigrett were cooking dinner. (ECF No. 15-2 at 107, 111.) Wyzga heard "a crash of the sound of a door just slamming open" and "two African-American males" enter the house with bandanas covering a portion of their faces. (*Id.* at 113–14.) The larger one, Castro, was holding a shotgun and ordered them to get on the floor. (*Id.* at 114, 116.) Collins and Castro then took turns going upstairs after asking where the money and marijuana were located. (*Id.* at 120, 124.) While Collins was upstairs, Castro hit Wyzga in the head and kicked him in the face. (*Id.* at 126.) During Castro's search of the upstairs, he located Wyzga's shotgun and returned downstairs with it. (*Id.* at 122.) The assailants then took Wyzga cell phone, car keys, $400 out of his wallet, and $50 out of his pocket. (*Id.* at 128–29.)

Wyzga heard Castro tell Batalon and Tigrett to remove their clothing and tell Collins to "[g]o feel their vaginas." (*Id.* at 131, 133.) Wyzga then heard Marquez tell him to get up, and when Collins came towards him, Wyzga grabbed him. (*Id.* at 133.) At that point, Marquez was struggling with Castro in the kitchen, and Batalon and Tigrett had gotten off of the floor and did not have any clothes on. (*Id.* at 136.) While Wyzga was struggling with Collins, he heard gunshots. (*Id.* at 136, 138.) Collins then bit Wyzga's hand, and, in return, Wyzga "bit off a large top portion of the skinnier guy's left ear." (*Id.* at 139.) Wyzga had Collins in a choke hold and tried to communicate with Tigrett to have her shoot Collins, but Collins got away and ran out the front door. (*Id.* at 140.) The four victims got into a vehicle and started driving away, but Marquez wanted to go back to the house to "dismantle the indoor agriculture equipment." (*Id.* at 143–44.) While Wyzga

///

8

and Marquez were inside the house, Batalon and Tigrett left in the vehicle. (*Id.* at 145.) A neighbor called law enforcement. (*Id.* at 146.)

Marquez, who was called as a witness following Wyzga, testified that he and Batalon were going to have a barbeque at their place on the evening of January 31, 2008. (ECF No. 15-3 at 11, 16.) After coming inside from barbequing outside, two men entered the residence, and one of the men, Castro, was pointing a shotgun and ordered everyone to get on the floor and frisked them. (*Id.* at 19–20, 23.) Batalon, Tigrett, and Marquez were in the kitchen while Wyzga was in the adjacent dining room. (*Id.* at 26.) After Castro asked where the money and marijuana were located, Castro told Collins to go upstairs and start searching for stuff. (*Id.* at 24.) Castro had the shotgun on Marquez's back while Collins was upstairs. (*Id.* at 28.) Following Collin's return, Castro went upstairs and later came back downstairs in an agitated state. (*Id.* at 28–29.) Castro then said, "'I think we should rape these bitches.'" (*Id.* at 31.) Collins then entered the kitchen and Marquez "heard the girls' clothes starting to get ripped off." (*Id.* at 32.) Marquez asked them to stop and Castro "[s]macked [him] in the head with the shotgun barrel." (*Id.* at 33.) Marquez heard Collins say "'[t]his bitch is loose'" and heard Castro unbuckling his belt. (*Id.* at 33–34.)

As Marquez felt the shotgun barrel being removed from his back, he yelled for Wyzga to get up and then "grabbed the shotgun barrels, and [he] st[u]ck them in the ground. And [he] push[ed] [him]self off from the wall, and [he] pin[ned] [Castro] against the stove, pointing the shotguns away . . . from everybody." (*Id.* at 35.) Batalon started hitting Castro with a frying pan and Tigrett, who "didn't have any bottoms on," "helped [Marquez] grab one of the shotguns from" Castro. (*Id.* at 40–41.) After Tigrett shot Castro with the shotgun, Marquez attempted to shoot Castro with the other shotgun. (*Id.* at 44–45.) Marquez testified that he believed he may have shot Castro in the leg. (*Id.* at 91.) Marquez then ordered Castro to get out of the residence, and, while pointing a shotgun at Castro, led him out of the house. (*Id.* at 46–47.) As Marquez was checking Castro's pockets outside the residence, he saw Collins run out of the residence and down the

9

street. (*Id.* at 48.) Marquez unsuccessfully tried to chase after him. (*Id.* at 49.) When Marquez came back to the residence, the four victims got in his vehicle to leave, at which time Castro was laying "halfway in the front yard, and halfway in the street." (*Id.* at 53–54.) After driving around for a little bit, Marquez decided it would be best to return to the residence, and when they get there, a vehicle pulled up and a man who looked like Collins emerged from the vehicle. (*Id.* at 55–56.) Marquez then grabbed one of the shotguns and started to unsuccessfully chase him. (*Id.* at 56, 58.) When he got back to the residence, Batalon and Tigrett were gone, and he started "trashing" his spare room with the grow equipment because he thought he would get in trouble. (*Id.* at 58.)

Batalon, who was called as a witness following Marquez, testified that she invited Tigrett over for dinner on January 31, 2008, to tell her that she was pregnant. (ECF No. 15-3 at 124, 128.) While Batalon was in the kitchen with Marquez and Tigrett and Wyzga was in the dining room, Batalon heard a door shut and then saw that two people had entered the home wielding a shotgun. (*Id.* at 130–32.). Castro, who was in front of Collins as they entered the house, had the gun and ordered them to get on the ground. (*Id.* at 133, 135.) Collins went upstairs while Castro watched the four victims and hit her in the head with the shotgun. (*Id.* at 137–38.) Collins returned after he failed to find anything, and after they searched Tigrett's purse, Castro went upstairs and found a shotgun. (*Id.* at 140–43.)

Batalon testified that one of the assailants grabbed her boob, pulled off her pants, touched her buttocks, touched her genitals, "tr[ied] to shove [the shotgun] in [her]," and took her shirt off. (*Id.* at 145–46, 148, 151, 153–54.) Batalon explained that she felt three hands simultaneously touching her during this time period. (*Id.* at 154.) Although she was unable to identify with further specificity which of the assailants was assaulting her, Balaton testified that she wrote in her voluntary statement that she "wanted to believe it was" Castro who was touching her and had pulled down her pants because she saw that Castro's pants were halfway down when he was later being pinned by Marquez. (*Id.* at 78–79, 81.) Batalon testified that it then "felt like both of them were trying to turn [her]

over." (*Id.* at 160.) As they were trying to roll her over, she "hear[d] like somebody slam the cabinet just really . . . loud" and heard Marquez tell Wyzga to get up. (ECF No. 15-4 at 8.) Batalon got up as well and saw Marquez "holding the defendant against the pantry cabinet." (*Id.*) Marquez and Castro were fighting over the two shotguns, and Castro's pants were halfway down. (*Id.*) Batalon hit Castro with a pan and then heard the shotgun fire. (*Id.* at 9–10.) Tigrett then told Batalon to move, and Tigrett fired the shotgun at Castro again. (*Id.* at 11-12.) Batalon hid behind Tigrett and found a shotgun laying on the floor. (*Id.* at 14.) Batalon gave the shotgun to Marquez who then told Castro to get out of the house. (*Id.* at 15.) Meanwhile, Batalon was looking for something to cover up with. (*Id.* at 15.) Eventually Castro stumbled out of the house, and Batalon went upstairs to find some clothing to put on. (*Id.* at 18, 22.)

## 2. Relevant Statutes and Legal Theories

As noted, in Ground Seven Castro only disputes the sufficiency of the evidence related to his convictions for sexual assault, attempted sexual assault, conspiracy to commit sexual assault, and kidnapping. (*See* ECF No. 7 at 40–43.) The Court addresses the relevant statutes and legal theories common to all four counts before turning to each challenged conviction.

At the time of Castro's conviction, NRS § 200.366(1)(a) provided that "[a] person who subjects another person to sexual penetration . . . against the will of the victim . . . is guilty of sexual assault." Nevada statute provided that "[a]n act done with the intent to commit a crime, and tending but failing to accomplish it, is an attempt to commit that crime." NRS § 193.330. Nevada law further provided that "whenever two or more persons conspire to commit . . . sexual assault . . . each person is guilty" of conspiracy. NRS § 199.480(1). NRS § 200.310 provided that "[a] person who willfully seizes, confines, inveigles, entices, decoys, abducts, conceals, kidnaps or carries away a person by any means whatsoever with the intent to hold or detail . . . is guilty of kidnaping." And NRS § 193.165 allowed for an additional penalty for "any person who uses a firearm or other deadly weapon . . . in the commission of a crime."

11

The jury was instructed that they could find Castro guilty of the four challenged counts under one of three theories of liability: that Castro directly committed the crime; that Castro aided and abetted Collins in the commission of the crime with the intent that the crime be committed; or that Collins engaged in a conspiracy with Collins to commit the crime. (ECF No. 16-3 at 7–9.)

### 3. Challenged Counts of Conviction

#### a. Sexual assault with the use of a deadly weapon

The Nevada Supreme Court's ruling that there was sufficient evidence to convict Castro of three counts of sexual assault with the use of a deadly weapon against Tigrett was reasonable.[2] Tigrett testified that Castro, while forcing her to lay in the kitchen and wielding a shotgun, "inserted one of his fingers inside of [her] . . . vagina," called Collins over and had him "also touch [her] vagina," and then either Castro or Collins "inserted the barrel of the gun into [her] vagina." (ECF No. 15-2 at 37–40.) Accordingly, based on this evidence, a rational trier of fact could have found beyond a reasonable doubt that Castro committed three counts of sexual assault with the use of a deadly weapon. *In re Winship*, 397 U.S. at 364; *Jackson*, 443 U.S. at 319; *Juan H.*, 408 F.3d at 1275 n.13; NRS § 200.366(1)(a); NRS § 193.165.

Castro asserts that the victims implicated Collins in the sexual assaults, not him. (ECF No. 7 at 41.) Indeed, this was Castro's defense at trial. (*See* ECF No. 17-7 at 26 (testimony of one of Castro's defense counsel at the post-conviction evidentiary hearing that the defense "focus was that Martin Castro did not commit a sexual assault and was basically following the lead of . . . Mr. Collins"); ECF No. 17-8 at 24 (testimony of Castro's other defense counsel that the defense was that Castro "went there to get money and drugs" and "he was not involved in any sexual assault").) However, because evidence is viewed "in the light most favorable to the prosecution," *Jackson*, 443 U.S. at 319, and because Tigrett's testimony demonstrated that Castro directly committed the first act of

///

---

[2]Castro was convicted of three counts of sexual assault with the use of a deadly weapon against Tigrett. (ECF No. 16-4 at 6–7.)

sexual assault, aided and abetted Collins to commit the second act of sexual assault, and either directly committed or aided and abetted Collins in the third act of sexual assault, Castro's argument that there was insufficient evidence to support these convictions lacks merit.

### b. Attempted sexual assault with the use of a deadly weapon

The Nevada Supreme Court's ruling that there was sufficient evidence to convict Castro of one count of attempted sexual assault with the use of a deadly weapon against Batalon was reasonable.[3] Batalon testified that "someone tried to put their hand into [her] genital area" and "[t]hey[ ] tr[ied] to open [her] legs up . . . with their hands, with the gun." (ECF No. 15-3 at 151.) However, Batalon "was squeezing [her] legs together as tight as [she] could," so they did not "actually ever go into [her] private area," but got close "[e]nough to just touch the lips of my private area." (*Id.* at 152.) Although Batalon was unable to identify which of the assailants was touching her, she explained that she felt three hands simultaneously touching her during this time period and that both Castro and Collin were standing around her and their voices were close to her. (*Id.* at 150, 154.) Therefore, based on this evidence, a rational trier of fact could have found beyond a reasonable doubt that Castro—either directly or through aiding and abetting Collins or through a conspiracy with Collins—attempted to sexual assault Batalon while wielding a gun. *In re Winship*, 397 U.S. at 364; *Jackson*, 443 U.S. at 319; *Juan H.*, 408 F.3d at 1275 n.13; NRS § 200.366(1)(a); NRS § 193.165; NRS § 193.330.

### c. Conspiracy to commit sexual assault

The Nevada Supreme Court's ruling that there was sufficient evidence to convict Castro of one count of conspiracy to commit sexual assault was reasonable.[4] Wyzga

///

---

[3]Castro was convicted of one count of attempted sexual assault with the use of a deadly weapon against Batalon. (ECF No. 16-4 at 6.)

[4]Castro was convicted of one count of conspiracy to commit sexual assault. (ECF No. 16-4 at 5.)

testified that he heard Castro tell Batalon and Tigrett to remove their clothing and tell Collins to "[g]o feel their vaginas." (ECF No. 15-2 at 131, 133.) And Marquez testified that he heard Castro say "'I think we should rape these bitches,'" Collins enter the kitchen, Batalon's and Tigrett's clothing getting ripped off, and Castro unbuckling his belt. (*Id.* at 31–34.) Based on this evidence and the evidence discussed previously regarding the sexual assaults of Tigrett and the attempted sexual assault of Batalon, a rational trier of fact could have found beyond a reasonable doubt that Castro and Collins conspired to commit sexual assault. *In re Winship*, 397 U.S. at 364; *Jackson*, 443 U.S. at 319; *Juan H.*, 408 F.3d at 1275 n.13; NRS § 200.366(1)(a); NRS § 199.480(1).

### d.  Kidnapping with the use of a deadly weapon

The Nevada Supreme Court's ruling that there was sufficient evidence to convict Castro of four counts of first-degree kidnapping with the use of a deadly weapon was reasonable.[5] Indeed, Tigrett, Wyzga, Marquez, and Batalon all testified that they were forced to get on the ground, were held at gunpoint while Castro and Collins took turns searching the residence and collecting items, and were struck with the shotgun in the head when they moved or talked. (ECF No. 15-2 at 14–32, 114–29; ECF No. 15-3 at 19–29, 133–43.) Based on this evidence, a rational trier of fact could have found beyond a reasonable doubt that Castro committed one count of kidnapping with the use of a deadly weapon against each of the four victims. *In re Winship*, 397 U.S. at 364; *Jackson*, 443 U.S. at 319; *Juan H.*, 408 F.3d at 1275 n.13; NRS § 200.310; NRS § 193.165.

Castro argues that there was insufficient evidence to support his kidnapping conviction because any restraint in the kitchen was entirely incidental to the robbery and served no independent purpose. (ECF No. 7 at 43.) The Nevada Supreme Court has held that "to sustain convictions for both robbery and kidnapping . . . arising from the same course of conduct, any movement or restraint must substantially increase the risk of danger to the victim over and above that necessarily present in the crime of robbery."

///

[5]Castro was convicted of one count of first-degree kidnapping with the use of a deadly weapon for each of the four victims. (ECF No. 16-4 at 3–4.)

*Mendoza v. State*, 130 P.3d 176, 177 (Nev. 2006). Because Castro and Collins struck the victims in the head with the shotgun on numerous occasions, the Nevada Supreme Court reasonably concluded that the restraint of the victims with the use of the shotgun increased the danger that they faced above that needed to commit the robbery.

Castro is denied federal habeas relief for Ground Seven.

## B.     Ground One

In Ground One, Castro argues that his federal constitutional rights were violated when his trial counsel failed to conduct a full and adequate cross-examination of the victims. (ECF No. 7 at 7.) Specifically, Castro alleges that his trial counsel failed to ask the victim about prior felony convictions and acts of dishonesty, and although the state mentioned the convictions briefly, that did not relieve his trial counsel from also questioning the witnesses. (*Id.* at 7–8.) In its order denying Castro's appeal of the denial of state habeas petition, the Nevada Supreme Court held:

> Castro argues that both of his trial counsel were ineffective because they failed to adequately cross-examine the victims regarding prior felony convictions. Castro acknowledges that information about prior convictions came out on direct examination for two of the victims but claims that, as the case turned on victim credibility, trial counsel should have emphasized the prior convictions on cross-examination. We conclude that the district court did not err in denying this claim as the jury was informed that two of the victims had prior convictions and, therefore, Castro failed to demonstrate deficiency or prejudice. [Footnote 1: To the extent that Castro now argues that trial counsel was ineffective for failing to cross-examine the victims regarding acts of dishonesty, this argument was not raised below, and we need not consider it on appeal in the first instance. *Davis v. State*, 107 Nev. 600, 606, 817 P.2d 1169, 1173 (1991), *overruled on other grounds by Means*, 120 Nev. at 1012-13, 103 P.3d at 33.].

(ECF No. 17-14.) The Nevada Supreme Court's rejection of Castro's *Strickland* claim was neither contrary to nor an unreasonable application of clearly established federal law.

In *Strickland*, the Supreme Court propounded a two-prong test for analysis of claims of ineffective assistance of counsel requiring the petitioner to demonstrate (1) that the attorney's "representation fell below an objective standard of reasonableness,"

and (2) that the attorney's deficient performance prejudiced the defendant such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984). A court considering a claim of ineffective assistance of counsel must apply a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. The petitioner's burden is to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687. Additionally, to establish prejudice under *Strickland*, it is not enough for the habeas petitioner "to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693. Rather, the errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687.

Where a state district court previously adjudicated the claim of ineffective assistance of counsel under *Strickland*, establishing that the decision was unreasonable is especially difficult. *See Harrington*, 562 U.S. at 104–05. In *Harrington*, the United States Supreme Court instructed:

> The standards created by *Strickland* and § 2254(d) are both "highly deferential," [*Strickland*, 466 U.S. at 689]; *Lindh v. Murphy*, 521 U.S. 320, 333, n.7, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), and when the two apply in tandem, review is "doubly" so, *Knowles* [*v. Mirzayance*, 556 U.S. 111, 123 (2009)]. The *Strickland* standard is a general one, so the range of reasonable applications is substantial. 556 U.S., at 123, 129 S.Ct. at 1420. Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonably argument that counsel satisfied *Strickland*'s deferential standard.

*Harrington*, 562 U.S. at 105; *see also Cheney v. Washington*, 614 F.3d 987, 995 (9th Cir. 2010) (internal quotation marks omitted) ("When a federal court reviews a state court's *Strickland* determination under AEDPA, both AEDPA and *Strickland*'s deferential standards apply; hence, the Supreme Court's description of the standard as doubly deferential.").

Tigrett and Batalon were the first and last victims to testify, respectively, at Castro's trial. Castro's trial counsel did not cross-examine Tigrett or Batalon about any prior convictions or acts of dishonesty. (*See* ECF No. 15-2 at 73–97, 106; ECF No. 15-4 at 40–75, 89–92.)

Wyzga testified second. During his direct-examination, Wyzga answered in the affirmative when the state asked him if he had "a conviction from 2004 in the [s]tate of Maryland for possession with intent to distribute." (ECF No. 15-2 at 112.) Wyzga also answered in the affirmative when the state asked him if there was marijuana and equipment to grow marijuana in the residence. (*Id.*) Castro's trial counsel did not cross-examine Wyzga about any prior conviction or act of dishonesty. (*See id.* at 150-184, 194.) However, during Castro's trial counsel's cross-examination, Wyzga did admit the following: "I realized that some of the things that I may have done could have possibly been in violation of local and [s]tate laws." (*Id.* at 155.)

Turning to Marquez, who testified third, he answered in the affirmative when he was asked on direct-examination if he had a felony conviction for "[h]ome invasion with a use and possession of short barrel shotgun" on August 14, 2002 in Las Vegas, Nevada. (ECF No. 15-3 at 11.) During direct-examination, Marquez also testified that he had about an ounce of marijuana in the residence on the day of the robbery, had marijuana grow equipment in a bedroom that he was in the process of setting up, and had been dishonest with law enforcement about the grow equipment and the fact that neighbors had attempted to purchase marijuana from him. (ECF No. 15-3 at 14–15, 61.) Castro's trial counsel did not cross-examine Marquez about any prior conviction or act of dishonesty. (*See id.* at 64–94, 101–113.)

Castro had two trial counsel: Nadine Morton and Josie Bayudan. (ECF No. 17-7 at 6–7.) Morton testified at the post-conviction evidentiary hearing that before the robbery, "Tigrett was arrested for trafficking cocaine. And on October 2008 she pled guilty to possession of [a] controlled substance." (ECF No. 17-7 at 16.) Morton explained that if Tigrett "didn't have a felony conviction we wouldn't have been able to inquire about

it," and, indeed, Tigrett's conviction "was given 543.3363 treatment," meaning her conviction was suspended. (*Id.* at 17, 22; *see also* ECF No. 15 at 11 (comment by the state at the trial outside of the presence of the jury that Tigrett "was arrested on a drug-related charge, and ultimately that case resolved to a stay of adjudication pursuant to NRS 453.3363").) Even though Morton attempted to get Tigrett's criminal history to be admitted at trial, "the Court denied that because that wasn't an adjudication that would come in under the statute." (ECF No 17-7 at 22.) Regarding Marquez and Wyzga, Morton testified that the state brought out their felony convictions, and unless their convictions were for "crime[s] of veracity[,] . . . the only thing that [defense counsel] could go into was the fact that it was a felony and the date and the place perhaps of where is occurred." (*Id.* at 23–24.)

Similarly, Bayudan testified at the post-conviction evidentiary hearing that Marquez "has a prior felony conviction," "Wyzga also had prior convictions," and Tigrett had been charged with possession of a controlled substance but had "t[aken] a 453.3363 deal," meaning "she had been not adjudicated because it was a stay." (ECF No. 17-8 at 5, 7.) Bayudan explained that the state and the defense did not elicit anything about Tigrett "because she wasn't a felon." (*Id.* at 10.) Regarding Marquez and Wyzga, Bayudan explained that she did not ask any further questions after the state elicited testimony of their prior convictions "[b]ecause it's already been elicited I didn't think it was going to make any difference in terms of our theme." (*Id.* at 29.)

With regard to impeaching a witness with a prior conviction, NRS § 50.095(1) provides that "[f]or the purpose of attacking the credibility of a witness, evidence that the witness has been convicted of a crime is admissible but only if the crime was punishable by death or imprisonment for more than 1 year under the law under which the witness was convicted." When impeaching a witness pursuant to NRS § 50.095(1), counsel can "inquir[e] into the number and names of the prior felony convictions." *Plunkett v. State*, 437 P.2d 92, 93–94 (Nev. 1968). The state introduced evidence of Wyzga's 2004 conviction for possession with the intent to distribute and Marquez's 2002 conviction for

home invasion. (ECF No. 15-2 at 112; ECF No. 15-3 at 11.) Although Castro's trial counsel did not ask any further questions regarding these convictions (*see* ECF No. 15-2 at 150–84, 194; ECF No. 15-3 at 64–94, 101–13), Morton and Bayudan both testified that the state had already elicited the type of conviction, date of conviction, and place of conviction during direct examination. (ECF No 17-7 at 23–24; ECF No. 17-8 at 29.) As there was nothing further for Morton or Bayudan to have inquired about, the Nevada Supreme Court reasonably concluded that Castro failed to demonstrate that his trial counsel were deficient. *Strickland*, 466 U.S. at 688.

Moreover, the Nevada Supreme Court reasonably concluded that Castro failed to demonstrate deficiency regarding the cross-examination of Tigrett. Tigrett's adjudication for possession of a controlled substance was stayed. (*See* ECF No. 17-7 at 16–17, 22; ECF No. 15 at 11; ECF No. 17-8 at 7.) Because a stay of adjudication pursuant NRS § 453.3363 is not a conviction, Castro's trial counsel were unable to impeach Tigrett in this regard and, as such, the Nevada Supreme Court reasonably concluded that they were not deficient. *Strickland*, 466 U.S. at 688.

Turning to Castro's argument that his trial counsel failed to cross-examine the witnesses about prior acts of dishonesty, Castro alleges that his trial counsel should have asked Marquez about being accused of attempted robbery with the use of a deadly weapon and conspiracy to commit robbery because these were crimes involving dishonesty. (ECF No. 7 at 11 (citing *Yates v. State*, 596 P.2d 239, 242 (Nev. 1979) ("[R]obbery and larceny involve dishonesty.")).) Castro also alleges that his trial counsel should have asked Tigrett about lying to law enforcement during the investigation of her charge for possession of a controlled substance. (*Id.* at 12.) Under NRS § 50.085(3) "[s]pecific instances of the conduct of a witness, for the purpose of attacking or supporting the witness's credibility, other than conviction of crime, may[,] . . . if relevant to truthfulness, be inquired into on cross-examination of the witness." Even if Castro's trial counsel was deficient for not asking Marquez and Tigrett further questions pursuant to NRS § 50.085(3), Castro cannot demonstrate prejudice. *Strickland*, 466 U.S. at 694.

Impeaching Marquez and Tigrett would still have left the testimonies of the other two victims, Wyzga and Batalon, who testified consistently with Marquez and Tigrett. *See Djerf v. Ryan*, 931 F.3d 870, 881 (9th Cir. 2019) ("*Strickland* prejudice is not established by mere speculation.").

Castro is therefore denied federal habeas relief for Ground One.

## C. Ground Two, Part A

In Ground Two, Part A, Castro alleges that his federal constitutional rights were violated when his trial counsel failed to conduct a reasonable and adequate pretrial investigation. (ECF No. 7 at 14.) Specifically, Castro explains that his trial counsel failed to adequately investigate the victims' criminal histories by uncovering the relevant police reports and court documents. (*Id.* at 15.) In its order denying Castro's appeal of the denial of state habeas petition, the Nevada Supreme Court held:

> Castro argues that trial counsel were ineffective because they failed to conduct adequate pretrial investigation. Castro claimed that trial counsel failed to conduct adequate pretrial investigation into the credibility of the victims or their motivations to lie, and the district court concluded that Castro failed to demonstrate what information would have been revealed with further investigation or that the information would have created a reasonable probability of a different outcome at trial. *See Molina v. State*, 120 Nev. 185, 192, 87 P.3d 533, 538 (2004) (a petitioner claiming that counsel did not conduct an adequate investigation must specify what a more thorough investigation would have uncovered). We conclude that the district court did not err in denying this claim. [Footnote 2: Castro appears to change his theory of inadequate pretrial investigation on appeal by claiming that counsel should have discovered information and documents surrounding the victims' prior convictions and arrests so as to cross-examine the victims with acts of dishonesty, *see supra* note 1; however, we need not consider this altered theory on appeal, *see Ford v. Warden*, 111 Nev. 872, 884, 901 P.2d 123, 130 (1995) (stating that petitioner cannot change theory on appeal).]

(ECF No. 17-14 at 4–5.) The Nevada Supreme Court's rejection of Castro's *Strickland* claim was neither contrary to nor an unreasonable application of clearly established federal law.

Morton testified at the post-conviction evidentiary hearing that she was aware that "[t]hree out of the four witness victims of the robbery . . . had felony records." (ECF

No. 17-7 at 6, 8.) Morton explained that she and Bayudan would have "confirmed with [their] investigator [and] with the computer system[, CJIS,] that [the three victims] did in fact have those felony convictions." (*Id.* at 9.) Morton also explained that they would have filed a discovery motion, and although she did not recall what information was received in response to that motion, she agreed that the state provided the victims' information from "NCIC." (*Id.* at 9–10, 23.) Morton did not recall whether she performed any further investigation, such as calling the victims' previous counsel or requesting that her investigator look into the victims' prior felonies. (*Id.* at 11.)

Similarly, Bayudan testified at the post-conviction evidentiary hearing that she knew about the victims' convictions "[f]rom the get go" and had access to the victims' prior arrests and convictions from a meeting with the state. (ECF No. 17-8 at 5, 7, 25.) Bayudan elaborated that she knew about Marquez's "guilty plea agreement, his booking records and everything." (*Id.* at 7.) Regarding Wyzga, Bayudan knew of his prior convictions, but she "didn't have any reports." (*Id.* at 26.) Regarding Tigrett, Bayudan "had the police report." (*Id.*) Bayudan explained that she knew about the victims' prior criminal histories "because [they were] trying to find a way to discredit them. To kind of support the idea that [Castro and Collins] were not there to[,] in fact[,] rob actually but there to purchase drugs." (*Id.* at 8.) Bayudan also explained that the rules of evidence would not have allowed her to "sort of retry those priors in this trial," so she made a strategic decision to not do any further investigation on the victims' prior convictions. (*Id.* at 28–29.)

Defense counsel has a "duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. Additionally, "[i]n any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Id.* This investigatory duty includes investigating the defendant's "most important defense," *Sanders v. Ratelle*, 21 F.3d 1446, 1457 (9th Cir. 1994), and investigating and introducing evidence

that demonstrates factual innocence or evidence that raises sufficient doubt about the defendant's innocence. *Hart v. Gomez*, 174 F.3d 1067, 1070 (9th Cir. 1999). When the record demonstrates that trial counsel was well-informed, and the defendant fails to provide what additional information would have been gained by the investigation he now claims was necessary, an ineffective assistance claim fails. *Eggleston v. United States*, 798 F.2d 374, 376 (9th Cir. 1986).

Regarding the defense team's investigation into the victims' criminal histories, Morton testified that she confirmed with her investigator and with CJIS that three of the victims had criminal records, that the defense team filed a discovery motion, and that the state provided the victims' "NCIC" reports. (ECF No. 17-7 at 9–10, 23; *see also* ECF No. 17-8 at 25 (testimony of Bayudan that the state provided information regarding the victims' prior arrests and convictions).) Bayudan testified that the rules of evidence would not have allowed her to "sort of retry those priors in this trial," so she made a strategic decision to not do any further investigation on the victims' prior convictions. (*Id.* at 28–29.) Because Castro's trial counsel made a reasonable decision that further investigations into the victims' criminal histories would not have been necessary due to the fact that further information would not have been admissible at trial, the Nevada Supreme Court's finding that Castro's trial counsel were not ineffective was not unreasonable. *Strickland*, 466 U.S. at 688, 691.

Castro is therefore denied federal habeas relief for Ground Two Part A.

### D.  Ground Three

In Ground Three, Castro alleges that his federal constitutional rights were violated when his trial counsel failed to make two timely and appropriate objections to questions posed by the state. (ECF No. 7 at 21.) Castro explains that these errors allowed the jury to hear evidence that was quite damaging to his defense. (*Id.* at 22.) Respondents argue that Castro ignores the fact that the answers to the questions were admissible. (ECF No. 32 at 18.) In its order affirming the denial of Castro's state habeas appeal, the Nevada Supreme Court held:

> Castro argues that trial counsel were ineffective because they failed to make appropriate objections at trial during the State's redirect examination of two of the victims. The district court found that trial counsel testified about strategic reasons for not objecting but also determined that the questions were summarizing evidence previously introduced and therefore that Castro failed to demonstrate a reasonable probability of a different result at trial had the objections been made. We conclude that the district court did not err in denying this claim.

(ECF No. 17-14 at 5.) The Nevada Supreme Court's rejection of Castro's *Strickland* claim was neither contrary to nor an unreasonable application of clearly established federal law.

During cross-examination, Castro's trial counsel asked Tigrett if she "testified at the Grand Jury that initially . . . the bigger buy was in charge." (ECF No. 15-2 at 95.) After reviewing her grand jury testimony while on the stand, Tigrett testified that that was correct, explaining that she "said it because yes, [she] felt he was in charge." (*Id.* at 96.) Castro's trial counsel then attempted to inquire further why Tigrett had used the word "initially" to qualify her response, and Tigrett explained that that was the word used in the question posed, and she was simply responding to the question. (*Id.* at 96–97.) A little while later, on redirect-examination, the following colloquy took place between the state and Tigrett:

> Q. Now you were asked questions in regards to whether you felt the big guy, the defendant was in charge initially. Remember those questions?
> A. Yes.
> Q. Specifically over the course of this evening, what did you ascertain the roles of the defendant and the skinny guy were?
> A. From the beginning to the end, I felt like the big guy was in charge. He was the one who would give the orders. He was the one who would initiate certain actions.
> Q. And that was throughout the entire evening?
> A. Yes.

(*Id.* at 105–06.) Castro takes issue with the fact that his trial counsel failed to object to the second question posed in the foregoing colloquy. Specifically, Castro argues that

///

23

this question calls for speculation and asks the witness to come to a legal conclusion about accomplice liability. (ECF No. 7 at 21.)

Later in the trial, Castro's trial counsel asked Wyzga during cross-examination about the comments he heard Collins making about Tigrett and Batalon while he was sexually assaulting them. (ECF No. 15-2 at 160.) During re-direct examination, the following colloquy took place between the state and Wyzga:

> Q. Damien, you recall some questions that you were asked in regards to - - about - - in regards to you stating that you heard the defendant say to have this - - for the girls to take their clothes off; do you remember those questions?
> A. Yeah.
> Q. Okay, that you were asked by Ms. Morton?
> A. Yeah.
> Q. And she asked you whether or not you had specifically told the detective that you heard the defendant say that. Do you recall her asking you about that?
> A. Yes.
> Q. Oaky. And then she asked you some questions about you using the general term "they" when describing what was happening; is that right?
> A. Correct.
> Q. *Okay. You actually told the detective a number of things that you heard in regards to the girls being sexually assaulted, do you remember that?*
> A. Yes.
> Q. Okay. Do you recall telling the detective - - talking to the detective about one of the suspects telling the girls to take their clothes off?
> A. I recall - - I recall the - - that, something along those lines."

(ECF No. 15-2 at 185–86 (emphasis added).) After Wyzga reviewed his statement on the stand, the colloquy continued as follows:

> Q. So do you recall telling the detective about hearing one of the suspects reference the looseness of the girls' vaginas?
> A. Yes, sir.
> . . .
> Q. Okay. So did you ever tell the detective specifically whether it was the bigger individual or the smaller individual that made either of those statements?
> A. No.
> Q. Okay. So you never told the detective which - - who it was specifically?

24

| | | |
|---|---|---|
| | A. | As far as I recall. |
| 1 | Q. | Did the detective ever ask you specifically who it was that was making those statements? |
| 2 | A. | No, as far as I recall. |
| 3 | Q. | And did you generally say that it was the suspects, or "they" that were making those statements? |
| 4 | A. | Yes, sir. |
| 5 | Q. | Okay. And you were never asked specifically by the detectives which one it was? |
| 6 | A. | As far as I recall. |

(*Id.* at 187–88.) Castro takes issue with the fact that his trial counsel failed to object to the italicized question in the foregoing colloquy. Specifically, Castro argues that this question assumes facts not in evidence (ECF No. 7 at 22.)

At the post-conviction evidentiary hearing, Morton testified that she generally makes objections when the state asks a leading question, but "it depends on the question. It depends on how [she] want[s] to present [herself] to the jury." (ECF No. 17-7 at 19.) Morton elaborated that if she makes an objection, the jury may see it as her "trying to cover something up [or] . . . stonewalling," or the jury may think that she is afraid of the answer. (*Id.* at 19, 30.) Regarding the first question that Castro argues should have been objected to, Morton testified that she strategically did not object "[b]ecause [the issue of Castro's role in the incident] was already introduced and it would be like [she's] trying to hide something from the jury." (*Id.* at 29–30.) Regarding the second question that Castro argues should have been objected to, Morton testified that she did not object because if the defense presents inconsistent statements, "the [s]tate could come back with prior consistent statements." (*Id.* at 30.)

Bayudan testified at the post-conviction evidentiary hearing about her theory on objecting at trial: "I was trained not be an obstructionist. And so unless I believe it is absolutely necessary and it doesn't - - it follows my theory of defense, I don't object." (ECF No. 17-8 at 16.) Regarding the first question that Castro argues should have been objected to, Bayudan testified that it was a leading question, and, in hindsight, she should have maybe objected. (*Id.* at 17–18.) However, Bayudan appeared to later alter that belief when she explained that "the defense brought up the issue of who was in

control," and "as a result of that the [s]tate later asked questions to clarify what the witness meant in the course of questioning as to why she believed one person was more in control than the other person." (*Id.* at 32–33.) Bayudan did testify that the defense should not have opened the door by asking about Castro's role in the robbery during cross-examination. (*Id.* at 33–34.) Regarding the second question that Castro argues should have been objected to, Bayudan testified that she believed it was an objectional question because it was leading and because it assumed facts not in evidence "if there w[as] no evidence of sexual assault entered prior to that statement." (*Id.* at 21.)

The Nevada Supreme Court reasonably concluded that Castro failed to demonstrate deficiency or prejudice regarding either question because Castro's trial counsel had strategic reasons for not objecting and because Castro failed to demonstrate a reasonable probability of a different result at trial had the objections been made. As a reminder, the first question that Castro takes issue with was a question by the state asking Tigrett about Castro's role in the robbery. (ECF No. 15-2 at 105–06.) This question during redirect-examination followed Castro's trial counsel's question on cross-examination inquiring about Tigrett's previous testimony that Castro was in charge. (*Id.* at 95.) Morton testified that she strategically did not object "[b]ecause [the issue of Castro's role in the incident] was already introduced and it would be like [she's] trying to hide something from the jury" if she had objected. (ECF No. 17-7 at 29–30.) Likewise, Bayudan testified that the defense opened to the door to the state's question. (ECF No. 17-8 at 32–33.) Although Castro argues that this question asked the witness to come to a legal conclusion on accomplice liability (ECF No. 7 at 21), the question appears to be asking Tigrett merely about her perception of the events that transpired and was based on previous questions that the defense had raised. Accordingly, the question was proper, and as such, the Nevada Supreme Court reasonably found that Castro failed to demonstrate deficiency or prejudice. *Strickland*, 466 U.S. at 688, 694.

The second question that Castro takes issue with was a question by the state asking Wyzga if he "actually told the detective a number of things that [he] heard in

regards to the girls being sexually assaulted." (ECF No. 15-2 at 185–86.) After Wyzga then reviewed his previous statement, the state went on to ask about a comment one of the assailants made and who Wyzga believed made the statement. (*Id.* at 187–88.) Although the state had not yet inquired into Wyzga's prior statements about the sexual assault to law enforcement until after this foundational, leading question was posed, it cannot be concluded that Castro's trial counsel's performances were deficient in not objecting to it. Indeed, Morton testified that the defense had previously asked Wyzga about his prior inconsistent statements and this general line of questioning by the state was about Wyzga's prior consistent statements. (ECF No. 17-7 at 30.) Moreover, even if Castro's trial counsel had objected to this specific question that allegedly assumed facts not yet in evidence, the state would have merely moved into evidence of Wyzga's prior statement had the objection been sustained. *See United States v. Bosch*, 914 F.2d 1239, 1246–47 (9th Cir. 1990) (a petitioner must demonstrate that the evidence or testimony "would not have been admissible" had his trial counsel not failed to object to its admission). Thus, again, Castro fails to demonstrate that the Nevada Supreme Court's conclusion that counsel was deficient or their performance resulted in prejudice was unreasonable. *Strickland*, 466 U.S. at 688, 694.

Castro is denied federal habeas relief for Ground Three.

### E.     Ground Five[6]

In Ground Five, Castro alleges that his federal constitutional rights were violated when the state district court improperly admitted his involuntary statements to the police. (ECF No. 7 at 27.) Castro explains that he was under the influence of oxycodone and morphine at the time he waived his rights. (*Id.* at 28.) In its order affirming Castro's convictions, the Nevada Supreme Court held:

> Before giving a statement to the police, Castro waived his Fifth Amendment rights. He argues that this waiver was not voluntary and therefore, the district court erred in admitting the statement over Castro's objection. We disagree.

---

[6]Because Ground Four addresses cumulative error, it will be addressed last.

A district court's voluntariness determination presents mixed questions of law and fact subject to de novo review. *Rosky v. State*, 121 Nev. 184, 190, 111 P.3d 690, 694 (2005). "A waiver is voluntary if, under the totality of the circumstances, the confession was the produce of a free and deliberate choice rather than coercion or improper inducement." *U.S. v. Doe*, 155 F.3d 1070, 1074 (9th Cir. 1998) (citing *United States v. Pinion*, 800 F.2d 976, 980 (9th Cir. 1986)). In determining voluntariness, this court considers "'[t]he youth of the accused; his lack of education or his low intelligence; the lack of any advice of constitutional rights; the length of detention; the repeated and prolonged nature of questioning; and the use of physical punishment such as the deprivation of food or sleep.'" *Alward v. State*, 112 Nev. 141, 155, 912 P.2d 243, 252 (1996) (quoting *Passama v. State*, 103 Nev. 212, 214, 735 P.2d 321, 323 (1987)).

Castro received oxycodone and morphine prior to the interview. This court noted that "mere intoxication will not preclude the admission of a defendant's statements unless it is shown that the intoxication was so severe as to prevent the defendant from understanding his statements or his rights." *Falcon v. State*, 110 Nev. 530, 534, 874 P.2d 772, 775 (1994) (citing *Stewart v. State*, 92 Nev. 168, 170-71, 547 P.2d 320, 321 (1976)). Although Castro received the two drugs prior to the interview, the testimony at the hearing on the motion to suppress Castro's statement demonstrated that Castro understood what was occurring. Further, Castro was able to correct the police detective when he misspelled Castro's name during the interview.

Castro argues that the small size of the hospital room, approximately ten feet by ten feet, created a coercive environment. However, the door to the room was open during the interview, and other courts have found that a similarly-sized room is not coercive. *See U.S. v. D'Antoni*, 856 F.2d 975, 981 (7th Cir. 1988) (finding a standard interview room of eight feet by twelve feet not coercive). Furthermore, the interrogation only lasted approximately one hour. In *Alward*, this court held that a defendant made a voluntary statement after an interrogation that lasted four to five hours. 112 Nev. at 146, 156, 912 P.2d at 247, 253.

Thus, the facts demonstrate that the detective did not use coercive tactics and that Castro voluntarily waived his Fifth Amendment rights.

(ECF No. 16-14 at 5–6.) This ruling by the Nevada Supreme Court was not objectively unreasonable.

A "defendant may waive effectuation of [his or her] rights, provided the waiver is made voluntarily, knowingly, and intelligently." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966); *see also Lego v. Twomey*, 404 U.S. 477, 478 (1972) (the admission into

28

evidence at trial of an involuntary confession violates a defendant's right to due process under the Fourteenth Amendment). A determination whether an accused's "statements obtained during custodial interrogation are admissible" is "made upon an inquiry into the totality of the circumstances surrounding the interrogation, to ascertain whether the accused in fact knowingly and voluntarily decided to forgo his rights to remain silent and to have assistance of counsel." *Fare v. Michael C.*, 442 U.S. 707, 724–25 (1979). The totality of the circumstances includes "both the characteristics of the accused and the details of the interrogation." *Dickerson v. United States*, 530 U.S. 428, 434 (2000); *see also Moran v. Burbine*, 475 U.S. 412, 421 (1986) ("Only if the totality of the circumstances surrounding the interrogation reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived."); *Withrow v. Williams*, 507 U.S. 680, 693–94 (1993) (explaining that the following are potential factors to look to in determining, based on a totality of the circumstances, whether a confession was voluntary: the element of police coercion; the length, location, and continuity of the interrogation; the defendant's maturity, education, physical condition, and mental health; whether the defendant was advised of his rights; and whether counsel was present). Regarding the accused's characteristics, an inculpatory statement is voluntary if it is the product of rational intellect and free will. *Blackburn v. Alabama*, 361 U.S. 199, 208 (1960). And regarding the interrogation, "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." *Colorado v. Connelly*, 479 U.S. 157, 167 (1986). Although a defendant's mental state is a "significant factor in the 'voluntariness' calculus,'" it "does not justify a conclusion that a defendant's mental condition, by itself and apart from its relation to official coercion, should ever dispose of the inquiry into constitutional 'voluntariness.'" *Id.* at 164.

On September 8, 2009, Castro moved to suppress the statements he made to the police detectives. (ECF No. 14.) The state district court held an evidentiary hearing

pursuant to *Jackson v. Denno*, 378 U.S. 368, 380 (1964)[7], which took place over the course of several days, on Castro's motion. (*See* ECF Nos. 14-8, 14-9, 14-10, 14-11, 14-14.)

Detective Ryan Jaeger testified at the evidentiary hearing that Castro was transported "via ambulance to the Trauma Center at UMC" following the robbery. (ECF No. 14-8 at 5, 8.) Detective Jaeger called the charge nurse on two consecutive days and was told both times that Castro was in surgery. (*Id.* at 8.) Detective Jaeger called the charge nurse four days later, and the charge nurse told him that Castro "was okay to give a statement." (*Id.*) Thereafter, on February 4, 2008, Detective Jaeger and Detective Smith made contact with Castro "[i]n the ICU at UMC." (*Id.* at 9.) Castro was laying in the hospital bed in a private room that measured approximately "10 x 10 or 12 x 12" feet. (*Id.* at 9–10.) The door to Castro's room was open at the time of the interview. (*Id.* at 11.)

When Detective Jaeger introduced himself and showed Castro his identification, Castro "tried to sit up and shake [his] hand, but [Detective Jaeger] could tell he was in a lot of pain, so [he] just had him lay back down in the bed." (*Id.* at 11.) Detective Jaeger advised Castro of his *Miranda* rights, and when Castro "said that he understood" and agreed to speak with him, Detective Jaeger proceeded to record the interview. (*Id.* at 11–12, 16.) While introducing the parties for the recording, Detective Jaeger explained that he was concerned about whether Castro "knew who he was talking to, so [he] spelled [Castro's] name wrong." (*Id.* at 14.) Castro corrected Detective Jaeger and "re-spelled his name . . . correctly." (*Id.*) During the interview, Castro stated that "[h]e needed some money for his kids, and he went in to do a robbery and it kind of went wrong." (*Id.*) Castro, however, denied sexually assaulting the victims, saying "it was the other guy that was with him." (*Id.* at 17.) At the end of the interview, Castro apologized and stated that "he felt that it was a mistake." (*Id.* at 20.) The interview itself lasted approximately

---

[7] *Jackson* stands for the proposition that "[a] defendant objecting to the admission of a confession is entitled to a fair hearing in which both the underlying factual issues and the voluntariness of his confession are actually and reliably determined." 378 U.S. at 380.

1    45 minutes while Detective Jaeger and Smith were in Castro's hospital room for
2    approximately an hour. (*Id.* at 20–21.)

3         Regarding Castro's state at the time of the interview, Detective Jaeger explained
4    that Castro, who was nineteen years old at the time, had "major shotgun wounds to both
5    his right arm and his left thigh" requiring a stay in the hospital that last several days and
6    that Castro had indicated that he was in pain and was on medication. (*Id.* at 14, 22, 28,
7    30.) While Detective Jaeger testified that no exigent circumstances demanded that the
8    interview be held while Castro was still in the ICU, Detective Jaeger had no concerns
9    that Castro could not understand the things that were being said to him or did not
10   understand the things that he was saying. (*Id.* at 15, 37.) In fact, Detective Jaeger did
11   not observe anything to cause him to believe that Castro was under the influence of
12   either morphine or oxycodone. (*Id.* at 42–43.)

13        Dr. Elijah Johnson testified that he treated Castro at the University Medical
14   Center. (ECF No. 14-10 at 8–9.) On February 4, 2008, two days before Castro's police
15   interview, his Glasgow Coma score, which checks a patient's "[a]bility to follow
16   commands, follow things with [their] eyes and . . . communicate," was 15, which was a
17   perfect score. (*Id.* at 25.) On the day of Castro's police interview, Castro was prescribed
18   morphine sulfate at "1200 hours, 1700 hours, [and] 2000 hours" hours and Percocet "at
19   0700 hours, noon, 1400 hours and 2330" hours. (*Id.* at 11–12.) Castro's police interview
20   took place at 1925 hours on February 4, 2008. (*Id.* at 14.) After the detectives left, a
21   nurse did an assessment of Castro and reported that Castro was "[a]lert and oriented
22   times 3, moving all extremities." (*Id.* at 37–38.) Although Dr. Johnson initially testified
23   that he did not see anything in Castro's medical records that would indicate any concern
24   regarding Castro's ability to communicate, that opinion changed following his review of
25   the recorded police interview. (*Id.* at 35–36.) After listening to the recorded police
26   interview during the evidentiary hearing, Dr. Johnson noted that Castro "said he's very
27   high" and said he "doesn't think he's ready. And then, you know, it kind of seems like he
28   wakes up towards the end of the tape, but in the earlier point I would think that he, you

31

know, had some narcotics on board at the point that he seemed a little bit altered." (*Id.* at 52–53.) Dr. Johnson estimated that Castro understood about 80 percent of what was occurring during the police interview. (*Id.* at 53.) In fact, Dr. Johnson explained that, based on Castro's communication during the police interview, if he needed to obtain Castro's consent "for some kind of surgical procedure, [he] would discuss it with [Castro's] family as well because . . . [he] wouldn't think that [Castro] was okay to give consent for something." (*Id.*)

Dr. Raymond Kelly, a forensic toxicologist, testified that morphine and oxycodone can impair one's intellectual thinking and that morphine depresses one's judgment skills. (ECF No. 14-10 at 58, 62.) Indeed, Dr. Kelly explained that morphine takes effect in a couple of minutes and would be at the highest blood concentration level within a couple of minutes. (*Id.* at 54, 57–58.) After listening to Castro's police interview, Dr. Kelly testified that he believed Castro was affected by the morphine and other drugs, explaining that he "did feel like there was some evidence of drug effects in the way that he was speaking." (*Id.* at 59, 72.) Dr. Kelly also explained that he "believe[d Castro] spoke less clearly at the beginning [of the interview] than he did at the end [of the interview]." (*Id.* at 75.)

The state presented two witnesses to combat the testimonies of Dr. Johnson and Dr. Kelly. First, Jeri Dermanelian, a sexual assault nurse, testified that, based on her review of Castro's medical records, there was no indication that Castro had a diminished capacity and that the charge nurse was okay with law enforcement speaking to Castro when they did. (ECF No. 14-10 at 76–77, 81, 86). Second, David England, a pharmacist, testified that based on Castro's medication schedule for February 4, 2008, he "would say that these medications wouldn't make it difficult for one to communicate." (ECF No. 14-11 at 3, 10) After listening to Castro's police interview, Dr. England explained:

> The patient sounded as if they were fairly alert as far as what I felt what was going on. They were alert - - they appeared not being able to answer the question and not know what happened prior to that. He appeared to be responsive to where he was, who he was, why he was there, what had

happened, and why he was being questioned, and he seemed to be giving straight answers. His answers didn't seem - - he wasn't slur - - I didn't indicate slurred speech. I didn't indicate confabulation, you know, making up things, losing tangential thought processings, you know, kind going off the record or going off the ideas that the person asking the questions was asking.

(*Id.* at 12.) Dr. England also noted that Castro was "cognizant and aware of what was going on" and was not unduly impaired by the medications or "receiving a lot of the side effects associated with the medication." (*Id.* at 14.) As far as Castro's communication changing from the beginning to the end of the interview, Dr. England noted that "towards the middle or towards the end, I think he was more involved in what was going on because of the anxiety level of the questions that were being asked, but I don't believe that there was a change of medication causing that." (*Id.* at 23.)

Following the testimony of the foregoing witnesses, the state district court denied Castro's motion to suppress, finding "it more probable than not that he clearly understood the questions and was not intoxicated to such an extent that he was unable to understand the meaning of his comments." (ECF No. 14-14 at 16.) The Nevada Supreme Court agreed with the state district court that Castro's waiver of his Fifth Amendment rights was voluntary, and the detectives did not use coercive tactics. This ruling was reasonable.

First, in assessing the "details of the interrogation," *Dickerson*, 530 U.S. at 434, although Detective Jaeger testified that there were no exigent circumstances demanding that he interview Castro while he was still in the ICU, Detective Jaeger waited to contact Castro until the charge nurse indicated that it was okay to do so. (ECF No. 14-8 at 8, 37.) Before conducting the interview, Detective Jaeger advised Castro of his *Miranda* rights and Castro "said that he understood" and agreed to speak with him. (*Id.* at 11–12, 16.) The police interview, which lasted approximately one hour, took place while Castro was lying in a hospital bed within a private room, which measured approximately "10 x 10 or 12 x 12" feet, in the ICU. (*Id.* at 9–11, 20–21). The door to Castro's room was open during the interview. (*Id.* at 11.)

Turning to "the characteristics of the accused," *Dickerson*, 530 U.S. at 434, Castro was nineteen years old at the time of the police interview and had recently suffered "major shotgun wounds to both his right arm and his left thigh" which required surgery and a stay in the ICU. (ECF No. 14-8 at 22, 28, 30.) Detective Jaeger testified that he "could tell [Castro] was in a lot of pain," and, in fact, Castro indicated that he was in a lot of pain and was taking several types of medication to combat his pain. (*Id.* at 11, 14.) Indeed, Castro's treating physician, Dr. Johnson, testified that he had received several doses of morphine and Percocet throughout the day of his police interview. (ECF No. 14-10 at 11–12.)

Regarding Castro's level of medication and its effect on his ability to communicate, Dr. Johnson testified that following his review of Castro's police interview, he estimated that Castro only understood 80 percent of what was happening, that Castro would not have been able to give consent to a surgical procedure in his current state, and that Castro sounded "a little bit altered" in the beginning of the interview. (ECF No. 14-10 at 52–53.) Similarly, Dr. Kelly testified that following his review of Castro's police interview, he believed Castro was affected by the medications and "believe[d Castro] spoke less clearly at the beginning" of the interview. (ECF No. 14-10 at 59, 75.) Dr. Kelly further testified that the medications Castro was taking can impair one's intellectual thinking. (*Id.* at 62.) Contrarily, Ms. Dermanelian, a nurse, testified that, based on her review of Castro's medical records, there was no indication that Castro had a diminished capacity. (ECF No. 14-10 at 76–77, 81.) And Dr. England, a pharmacist, testified that based on Castro's medication schedule for February 4, 2008, he "would say that these medications wouldn't make it difficult for one to communicate." (ECF No. 14-11 at 3, 10.) Dr. England also explained that Castro sounded alert, responsive, and cognizant during the police interview and that any change in Castro's level of communication during the police interview was due to his anxiety regarding the questions being asked. (*Id.* at 12, 14, 23.) Likewise, Detective Jaeger also testified that he had no concerns that Castro

///

34

could not understand the things that were being said to him or did not understand the things that he was saying. (ECF No. 14-8 at 15, 37.)

It is also worth noting that, unrelated to his medication, Castro had a perfect score on the Glasgow Coma score, which checks a patient's "[a]bility to follow commands, follow things with [their] eyes and . . . communicate," prior to his police interview. (ECF No. 14-10 at 25.) And following his police interview, a nurse assessed Castro and reported that he was alert and oriented. (*Id.* at 37–38.) Moreover, at the beginning of the police interview, Detective Jaeger explained that he purposefully misspelled Castro's name to check his cognition, and Castro caught the mistake and corrected Detective Jaeger. (ECF No. 14-8 at 14.)

After assessing "the totality of the circumstances surrounding the interrogation," *Fare*, 442 U.S. at 724–25, it cannot be concluded that Castro's waiver was involuntary. The police interview was continuous, was not especially extensive, was conducted in a hospital room with the door open, and took place after a charge nurse indicated that Castro was okay to give a statement. *See Withrow*, 507 U.S. at 693–94. These facts do not support a finding that Castro was coerced into waiving his rights. Further, Castro may have been young, in poor physical health, and medicated during his police interview. *Id.* However, the testimony of Dr. England and Detective Jaeger demonstrated that Castro's medication did not affect his ability to communicate. Although Drs. Johnson and Kelly testified that Castro sounded less clear in the beginning of the police interview, this testimony is insufficient to show that Castro's statement was not the product of rational intellect and free will. *Blackburn*, 361 U.S. at 208. Indeed, Castro's medical reports before and after the police interview demonstrate that he was alert and able to communicate, and Castro caught Detective Jaeger's mistake in spelling his name. These facts demonstrate that Castro had "the requisite level of comprehension" to waive his rights. *Moran*, 475 U.S. at 421. Accordingly, the Nevada Supreme Court reasonably determined that Castro understood what was occurring. *See, e.g.*, *Matylinsky v. Budge*, 577 F.3d 1083, 1095 (9th Cir. 2009) (explaining that "the Supreme Court has never said

that impairments from drugs, alcohol, or other similar substances can negatively impact" the waiver of one's *Miranda* rights and that it has "held that an intoxicated individual can give a knowing and voluntary waiver, so long as that waiver is given by his own free will").

Castro is thus denied federal habeas relief for Ground Five.

## F.    Ground Six

In Ground Six, Castro alleges that his federal constitutional rights were violated when the state district court denied his motion for a new jury after a panel member implied that he was incarcerated. (ECF No. 7 at 37.) In its order affirming Castro's convictions, the Nevada Supreme Court held:

> Castro contends that a prospective juror's statements in front of the jury panel prejudiced the entire jury panel and the district court should have granted the motion for a new jury venire. We disagree.
>
> A prospective juror stated in front of the entire prospective jury panel that she "may or may not know [Castro] . . . through [her] employment." That prospective juror later mentioned that she worked at the Clark County Detention Center's law library. It is unlikely that the prospective jury members were able to connect that prospective juror's statements, as another juror spoke and the judge asked other questions between the prospective juror's first statement and second statement. Furthermore, the evidence of Castro's arrest, confession and the type of crimes charged would independently cause the jury to learn of Castro's incarceration. *See, e.g., McDonald v. State*, 881 So.2d 895, 903 (Miss. Ct. App. 2004) (finding that no occurred where a prospective juror mentioned the defendant was incarcerated because it was obvious that the defendant had been arrested and would have been incarcerated at some point). Finally, the district court properly instructed the jury on the presumption of innocence. Thus, the district court did not err in denying Castro's motion for a new jury venire.

(ECF No. 16-14 at 6–7.) This ruling by the Nevada Supreme Court was not objectively unreasonable.

During voir dire, the state district court asked the prospective jurors if anyone was "acquainted with the defendant, Mr. Castro, or either of his counsel." (ECF No. 15 at 28.) Prospective juror Caron indicated that she "may or may not know the accused." (*Id.* at 29.) The state district court then asked "how [did she] believe [she] may know the

accused," to which prospective juror Caron responded, "[j]ust through my employment." (*Id.*) The state district court then asked the prospective jurors if any of them knew the prosecutors, if anyone had a close relationship with an employee of the district attorney's office, if anyone was familiar with the state district court judge, if anyone was familiar with any of the court staff, and if anyone was familiar with any of the proposed witnesses. (*Id.* at 29–31.) In response to the last question, prospective juror Caron indicated that she "may also know the metro police officers." (*Id.* at 31.) The state district court asked what prospective juror Caron did for a living, and she responded, "I work at the Clark County Detention Center, Law Library." (*Id.*) The state district court then went on to address other prospective jurors' affirmative answer to that question. (*See id.*)

Later, outside the presence of the prospective jurors, Castro's trial counsel "note[d] for the record, based on [prospective juror Caron's] statement that she knows [Castro] and that she has seen him at the detention center, . . . that's highly prejudicial and [Castro] should be given other panel." (*Id.* at 87.) The state district court stated that it was "not inclined to replace the panel," rather, it was "inclined to excuse her so she stops talking." (*Id.* at 88.) The state district court then explained:

> You know, I know for a fact that the lady that worked at the jail did not say at the beginning that she worked in the jail library. I also know that she said, "I may know the defendant," and I also know that she said that she knew officers or may know officers.
>
> You know, it's my view that your client has a right to an - - he doesn't have a right to, you know, an appearance that he was never in custody in the past. People reasonably expect that on violent felony allegations that at some point someone's arrested, and I assume that there'll be evidence of that.
> . . .
> Okay. So the issue is whether he has a right to have a jury free of any knowledge that he's in custody during the trial, which obviously, he has a right to that.
>
> And so the question becomes, there's no - - no clear basis to assume that anyone would presume that he was in custody now, based upon our comments, or that she even really knows him. I may be, along with, I may be familiar with a bunch of police officers, none of which I can actually give a name to, is just as generic as it gets.

> So the question becomes, I would be included to allow you to question the jury on this, or I would offer to give an admonishment to the jury with follow-up with questioning, if you so choose, or just wait and see what questioning comes out.
> . . .
>
> So I was inclined to call her in, because if I made a statement later that somehow she - - you know, if she had a specific recollection of your client or she's just saying that, because anybody on trial could have been at the Law Library at the jail, so that I can make an assessment as to whether she was jury - - you know - - whether she really thinks he looks familiar, or whether she is just saying that because she works at the jail and this person's charged with a crime, and then go from there with the rest of the panel. Clearly, she's going to be excused, but I'd like to ask her that question outside the presence. (*Id.* at 90–91.)

Prospective juror Caron was brought into the courtroom outside the presence of the other prospective jurors. The state district court asked her if she may know Castro because he "looks familiar to [her], or is that because it's a criminal case and [she] assume[d] he's been arrested and he may or may not be in custody in the jail." (*Id.* at 92–93.) Prospective juror Caron explained that she "see[s] 6 groups of 15 inmates per day in the Law Library, and [she] also respond[s] to numerous kites, . . . [a]nd his name does sound familiar. [She was] not sure if it's because he has visited the Law Library or had kites." (*Id.* at 93.) In response to the state district court's questioning, prospective juror Caron stated that there could be "a lot of Castros at the jail" and that "[o]ff the top of [her] head [she did] not know" if Castro was in custody. (*Id.*) The state district court then indicated that it believed:

> it's a close call, but [its] concern is that it's - - she said, "may have known" - - "I may have seen him in my employment." It's about as innocuous as it gets. And you know, the jury has a - - a right - - you client has a right to not have the jury know he's in custody now, but it's going to come in that he was arrested. No one on the planet thinks that these kinds of allegations occur and they don't get arrested.

(*Id.* at 96–97.) Castro's trial counsel then indicated that she did not want an admonishment to be provided "because we [do not] want to highlight it even more." (*Id.* at 97.)

"The right to a fair trial is a fundamental liberty secured by the Fourteenth Amendment." *Estelle v. Williams*, 425 U.S. 501, 503 (1976). The right to a fair trial guarantees "that 'one accused of a crime is entitled to have his guilt or innocence determined solely on the basis of the evidence introduced at trial, and not on grounds of official suspicion, indictment, continued custody, or other circumstances not adduced as proof at trial.'" *Holbrook v. Flynn*, 475 U.S. 560, 567 (1986) (quoting *Taylor v. Kentucky*, 436 U.S. 478, 485 (1978)). In order to protect this right, "courts must be alert to factors that may undermine the fairness of the fact-finding process." *Estelle*, 425 U.S. at 503. Indeed, "the probability of deleterious effects of fundamental rights calls for close judicial scrutiny." *Id.* at 504. That being noted, the U.S. Supreme Court has "[r]ecogniz[ed] that jurors are quite aware that the defendant appearing before them did not arrive there by choice or happenstance." *Holbrook*, 475 U.S. at 567. Rather, "[t]o guarantee a defendant's due process rights under ordinary circumstances, our legal system has instead placed reliance on the adversary system and the presumption of innocence." *Id.* Therefore, "[w]hen defense counsel vigorously represents his client's interests and the trial judge assiduously works to impress jurors with the need to presume the defendant's innocence, we have trusted that a fair result can be obtained." *Id.* at 567–68.

The Nevada Supreme Court reasonably concluded that Castro's right to a fair trial was not impacted such that the state district court erred in denying his motion for a new jury venire. As the Nevada Supreme Court first noted, after prospective juror Caron explained that she may have known Castro through her employment, there were several other questions posed by the state district court before prospective juror Caron responded to a different question stating that she was employed by the Clark County Detention Center. (ECF No. 15 at 29–31.) Not only may the other prospective jurors not have connected prospective juror Caron's first and second statements, but also, as the state district court pointed out, prospective juror Caron's statements about recognizing Castro were indefinite. Additionally, as the Nevada Supreme Court also noted, the jury

would independently glean that Castro was incarcerated at some point due to the nature of the offenses. *See Holbrook*, 475 U.S. at 567 (recognition from the Supreme Court that it has "never tried . . . to eliminate from trial procedures every reminder that the [s]tate has chosen to marshal its resources against a defendant to punish him for allegedly criminal conduct"). For example, Detective Ryan Jaeger testified during the trial that when he met with Castro at the hospital, "there was a corrections officer in the room with [Castro]." (ECF No. 15-6 at 46, 58.) Finally, the Nevada Supreme Court reasonably noted that the jury was instructed that "[t]he Defendant is presumed innocent until the contrary is proved. This presumption places upon the [s]tate the burden of proving beyond a reasonable doubt every material element of the crime charged and that the Defendant is the person who committed the offense." (ECF No. 16-3 at 15.). This instruction helped "guard against dilution of the principle that guilt is to be established by probative evidence and beyond a reasonable doubt." *Estelle*, 425 U.S. at 503. Accordingly, after closely scrutinizing the issue, this Court determines that the Nevada Supreme Court reasonably concluded that Castro's right to a fair trial was not impeded due to prospective juror Caron's statements. *Id.* at 503–04.

Castro is denied federal habeas relief for Ground Six.

### G. Ground Eight

In Ground Eight, Castro alleges that his federal constitutional rights were violated when the state district court provided improper jury instructions and rejected his proposed jury instructions. (ECF No. 7 at 45.) Issues relating to jury instructions are not cognizable in federal habeas corpus unless they violate due process. *Estelle v. McGuire,* 502 U.S. 62, 72 (1991); *see also Gilmore v. Taylor*, 508 U.S. 333, 342 (1993) ("[W]e have never said that the possibility of a jury misapplying state law gives rise to federal constitutional error."). The question is "'whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process', . . . not merely whether 'the instruction is undesirable, erroneous, or even universally condemned.'" *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977) (quoting *Cupp v. Naughten*, 414 U.S. 141, 146–47

(1973)). When reviewing a jury instruction, this Court considers that jury instruction "in the context of the instructions as a whole and the trial record." *Estelle*, 502 U.S. at 72; *see also United States v. Frega*, 179 F.3d 793, 806 n.16 (9th Cir. 1999) ("In reviewing jury instructions, the relevant inquiry is whether the instructions as a whole are misleading or inadequate to guide the jury's deliberation."). Furthermore, jurors are presumed to follow the instructions that they are given. *United States v. Olano*, 507 U.S. 725, 740 (1993). Even if an instruction contains a constitutional errors, this Court must then "apply the harmless-error analysis mandated by *Brecht*[ *v. Abrahamson*, 507 U.S. 619 (1993)]." *Calderon v. Coleman,* 525 U.S. 141, 146 (1998). The question is whether the error had a "substantial and injurious effect or influence in determining the jury's verdict." *Id.* at 145.

## 1. Jury Instruction 5

Castro argues that the word "until" in the reasonable doubt jury instruction should have been replaced with "unless" because "until" implies that a finding of guilt is a foregone conclusion. (ECF No. 7 at 45.) In Castro's appeal of his judgment of conviction, the Nevada Supreme Court held:

> Castro contends that the district court abused its discretion by refusing to substitute "unless" for "until" in jury instruction 5. In *Blake v. State*, this court allowed the use of "until" in a jury instruction, holding that when "read as a whole," the instruction does not imply that the State will eventually prove guilt. 121 Nev. 779, 799, 121 P.3d 567, 580 (2005). Jury instruction 5, read as a whole, properly outlined the State's burden. Thus, the district court did not abuse its discretion in giving jury instruction 5.

(ECF No. 16-14 at 13–14.) This ruling was reasonable.

The instruction in issue—Jury Instruction 5—provided as follows:

> The Defendant is presumed innocent until the contrary is proved. This presumption places upon the State the burden of proving beyond a reasonable doubt every material element of the crime charged and that the Defendant is the person who committed the offense.
>
> A reasonable doubt is one based on reason. It is not mere possible doubt but is such a doubt as would govern or control a person in the more weighty affairs of life. If the minds of the jurors, after the entire comparison and

41

consideration of all the evidence, are in such a condition that they can say they feel an abiding conviction of the truth of the charge, there is not a reasonable doubt. Doubt to be reasonable must be actual, not mere possibility or speculation.

If you have a reasonable doubt as to the guilt of the Defendant, he is entitled to a verdict of not guilty.

(ECF No. 16-3 at 15.)

This reasonable doubt jury instruction was merely identical[8] to the reasonable doubt jury instruction analyzed in *Ramirez v. Hatcher*, 136 F.3d 1209, 1210–11 (9th Cir. 1998). Indeed, the reasonable doubt jury instruction in Ramirez also used the word "until" instead of "unless" in the first sentence. *Id.* And in *Ramirez*, the jury instruction was found to not "unconstitutionally misstate the concept of reasonable doubt." *Id.* at 1214. Thus, Castro fails to demonstrate that Jury Instruction 5 violated his due process rights. *Estelle,* 502 U.S. at 72.

### 2. Jury Instruction 11

Castro argues that Jury Instruction 11 created the possibility that the jury could convict him for open and gross lewdness even if he did not actually conspire to commit that offense. (ECF No. 7 at 47.) In Castro's appeal of his judgment of conviction, the Nevada Supreme Court held:

Castro argues that the last line of jury instruction 11 creates the possibility that the jury could find Castro liable for open and gross lewdness, even though he did not conspire to commit that offense. The jury found Castro guilty of conspiracy to commit sexual assault. Open and gross lewdness is a reasonably foreseeable further crime. Furthermore, there was sufficient evidence to convict Castro of open and gross lewdness on a theory of direct

---

[8]The only difference between the reasonable doubt jury instruction provided in Castro's trial and the reasonable doubt jury instruction provided in *Ramirez* was the omission of the word "substantial." *Compare* ECF No. 13-18 at 19 ("[D]oubt to be reasonable, must be actual, not mere possibility or speculation."), *with Ramirez v. Hatcher*, 136 F.3d 1209, 1210–11 (9th Cir. 1998) ("[D]oubt to be reasonable must be actual *and substantial*, not mere possibility or speculation.") (emphasis added). However, because "the use of the term 'substantial' to describe reasonable doubt has been disfavored," *Ramirez*, 136 F.3d at 1212, the reasonable doubt jury instruction provided in Castro's trial was even more acceptable than the reasonable doubt jury instruction in *Ramirez*.

1    commission of the offense. Thus, the district court acted within its discretion
2    regarding jury instruction 11.

3    (ECF No. 16-14 at 14.) This ruling was reasonable.

4        The instruction in issue—Instruction No. 11—provided as follows:

5        Each member of a criminal conspiracy is liable for each act and bound by
6        each declaration of every other member of the conspiracy if the act or the
         declaration is in furtherance of the object of the conspiracy.

7        The act of one conspirator pursuant to or in furtherance of the common
8        design of the conspiracy is the act of all conspirators. Every conspirator is
         legally responsible for a specific intent crime of a co-conspirator so long as
9        the specific intent crime was intended by the Defendant. A conspirator is
10       also legally responsible for a general intent crime that follows as one of the
         reasonably foreseeable consequence of the object of the conspiracy even
11       if it was not intended as part of the original plan even if he was not present
         at the time of the commission of such act.
12

13   (ECF No. 16-3 at 21.)

14       The Nevada Supreme Court reasonably concluded that there was sufficient

15   evidence to convict Castro of open and gross lewdness on a theory of direct commission

16   of the offense, such that Instruction No. 11 was proper. Tigrett testified that Castro

17   grabbed her breasts, pulled her "pants down halfway," and "grop[ed her] bottom." (ECF

18   No. 15-2 at 35–37.) And Batalon testified that one of the assailants grabbed her boob,

19   pulled off her pants, and "spanked . . . , grabbed . . . , [and] jiggled" her buttocks. (ECF

20   No. 15-3 at 146, 148.) As was noted in Ground Seven, although Batalon was unable to

21   identify which of the assailants was touching her, she explained that she felt three hands

22   simultaneously touching her during this time period and that both Castro and Collin were

23   standing around her and their voices were close to her. (*Id.* at 150, 154.) Because there

24   was sufficient evidence that Castro directly committed acts of lewdness on Tigrett and

25   Batalon, the last line of Jury Instruction 11, which addressed conspirator liability, was

26   irrelevant and did not violate Castro's due process rights. *Id.* at 72.

27   ///

28   ///

43

### 3. Jury Instruction 15

Castro argues that Jury Instruction 15 failed to advise the jury that he was entitled to a not guilty verdict if the state failed to prove his active and direct involvement in the crime, which was Castro's theory of the case. (ECF No. 7 at 47.) In Castro's appeal of his judgment of conviction, the Nevada Supreme Court held:

> Castro also argues that the district court abused its discretion by not including the last paragraph of one of Castro's proposed jury instructions in jury instruction 15. The paragraph from Castro's proposed jury instruction states, "[i]f the State does not prove beyond a reasonable doubt that a [d]efendant either [d]irectly and actively committed the act constituting the offense or who knowingly and with the criminal intent aided and abetted in its commission, then the [d]efendant is entitled to a not guilty verdict." This paragraph repeats jury instruction 15's language. Thus, the district court acted within its discretion in rejecting Castro's proposed additional paragraph to jury instruction 15.

(ECF No. 16-14 at 14–15.) This ruling was reasonable.

The instruction in issue—Instruction No. 15—provided as follows:

> Where two or more persons are accused of committing a crime together, their guilt may be established without proof that each personally did every act constituting the offense charged.

> All persons concerned in the commission of a crime who either directly and actively commit the act constituting the offense or who knowingly and with criminal intent aid and abet in its commission or, whether present or not, who advise and encourage its commission, with the intent that the crime be committed, are regarded by the law as principals in the crime thus committed and are equally guilty thereof.

> A person aids and abets the commission of a crime if he knowingly and with criminal intent aids, promotes, encourages or instigates by act or advice, the commission of such crime with the intention that the crime be committed.

> Every person who aids and abets in the commission of a crime is legally responsible for a specific intent crime of another person so long as the specific intent crime of that other person was intended by the Defendant. A person who aids and abets in the commission of a crime is also legally responsible for a general intent crime that follows as one of the reasonably foreseeable consequences of the acts of another, and even if he was not present at the time of the commission of such act.

The State is not required to prove precisely which defendant actually committed the crime and which defendant aided and abetted.

The State has the burden of proving beyond a reasonable doubt that Defendant aided and abetted in the commission of a crime for the Defendant to be found guilty under an aiding and abetting theory.

(ECF No. 16-3 at 25.)

The Nevada Supreme Court reasonably determined that Jury Instruction 15 already included the information that Castro wanted added. The second paragraph of Jury Instruction 15 provided that Castro was guilty of the crime if he "either directly and actively commit[ted] the act" or if he aided and abetted in its commission. (ECF No. 16-3 at 25.) Castro's proposed additional language was merely the inverse of this paragraph: Castro was not guilty of the crime if he was not actively and directly involved in the crime or did not aid and abet in its commission. This inverse is redundant and unnecessary. Accordingly, Castro fails to demonstrate that Jury Instruction 15 violated his due process rights. *Id.* at 72.

### 4. Jury Instruction 29

Castro argues that the "no corroboration" language used in Jury Instruction 29 singled out the complainants' testimony as deserving particular emphasis and consideration. (ECF No. 7 at 47.) In Castro's appeal of his judgment of conviction, the Nevada Supreme Court held:

Castro also contends that the district court abused its discretion in providing instruction 29 to the jury as it contained an unwarranted assumption regarding the veracity of the complaining witness. Castro objected to this instruction in district court but failed to state the grounds and reasons for the objection. "[F]ailure to specifically object on the grounds urged on appeal preclude[s] appellate consideration on the grounds not raised below." *Pantano v. State*, 122 Nev. 782, 795 n.28, 138 P.3d 477, 485 n.28 (2006) (citing *Merica v. State*, 87 Nev. 457, 462, 488 P.2d 1161, 1164 (1971)). Thus, we will not review Castro's challenge to instruction 29.

(ECF No. 16-14 at 13 n.5.)

The instruction in issue—Jury Instruction 29—provided as follows: "There is no requirement that the testimony of a victim of sexual assault be corroborated, and her

45

testimony standing alone, if believed beyond a reasonable doubt, is sufficient to sustain a verdict of guilty." (ECF No. 16-3 at 39.)

During discussions about the jury instructions, Castro's trial counsel objected to Jury Instruction 29, stating, "[w]e believe that this instruction should not be given. We believe that it's improper." (ECF No. 15-6 at 128.) The state district court then stated that the language in Jury Instruction 29 is "the law in this [s]tate. And if the Supreme Court changes this law, there will be a lot of I guess sexual assault victims that will be out of luck, since most sexual assaults don't happen with an audience. Save and except this particular case, if it happened." (*Id.*) The state district court then indicated that it was "going to give this instruction over [the] objection." (*Id.*) Later, the state district court summarized the Castro's objection to Jury Instruction 29: "the defense objected for the record. They didn't believe it was an inaccurate statement of the law; they just object. They think the law should be changed." (ECF No. 15-8 at 5.) Thus, as the Nevada Supreme Court reasonably concluded, Castro's trial counsel failed to give the reasons for their objection to Jury Instruction 29.

Further, in *Bruce v. Terhune*, the Ninth Circuit Court of Appeals explained that the following no-corroboration jury instruction was given: "[i]t is not essential to a conviction of the charge that the testimony of the witness with whom sexual contact is alleged to have occurred be corroborated by other evidence." 376 F.3d 950, 954 (2004). The Ninth Circuit Court of Appeals held that "the instruction[ ] comport[ed] with . . . due process standards" because "the instructions as a whole made clear to the jury that the prosecution bore the burden of proving each element of the crime beyond a reasonable doubt." (*Id.* at 955–56.) Similarly, in addition to the no-corroboration instruction, which itself provided that a conviction could only be sustained if the jury believed the victim beyond a reasonable doubt, the jury in Castro's trial was instructed that the state had "the burden of proving beyond a reasonable doubt every material element of the crime charged and hat the Defendant is the person who committed the offense." (ECF No. 16-3 at 15.) Therefore, after reviewing Castro's jury instructions as a whole, it cannot be

1    determined that Jury Instruction 29 violated Castro's due process rights. *Estelle,* 502
2    U.S. at 72.

3                           **5.  Jury Instruction 30**

4         Castro argues that Jury Instruction 30 was vague and that the state district court

5    should have given his proposed jury instructions instead. (ECF No. 7 at 49.) In Castro's

6    appeal of his judgment of conviction, the Nevada Supreme Court held:

7         In *Berry v. State*, this court held that a jury instruction similar to jury
8         instruction 30 was not vague. 125 Nev. 265, 283, 212 P.3d 1085, 1097-98
          (2009), *abrogated on other grounds by State v. Castaneda*, 126 Nev. ___,
9         ___, 245 P.3d 550, 553 (2010). In *Barry*, the jury instruction stated that open
          lewdness means "'acts which are committed in a private place, but which
10        are nevertheless committed in an "open" as opposed to a "secret" manner.'"
          *Id.* at 283, 212 P.3d at 1097. Furthermore, the jury instruction defined gross
11        as "'being indecent, obscene or vulgar'" and lewdness as "'any act of a
12        sexual nature which the actor knows is likely to be observed by the victim
          who would be affronted by the act.'" *Id.* Jury instruction 30 is nearly the
13        same as the instruction that this court held was not vague in *Berry*. *See id.*
          Thus, jury instruction 30 was not vague.
14

15   (ECF No. 16-14 at 15–16.)

16        The jury instruction in issue—Jury Instruction 30—provided:

17        Open and Gross Lewdness is defined as any indecent, obscene or vulgar
          act of a sexual nature that:
18              (1) is intentionally committed in a public place, even if the act is not
19              observed; or
                (2) is committed in a private place, but in an open manner, as
20              opposed to a secret manner, and with the intent to be offensive to
                the observer.
21        Open and Gross Lewdness is a general intent crime.

22

23   (ECF No. 16-3 at 40.)

24        As the Nevada Supreme Court reasonably concluded, Jury Instruction 30 was

25   similar to the jury instruction in *Berry v. State* that the Nevada Supreme Court found was

26   proper. 212 P.3d 1085, 1097–98 (Nev. 2009), *abrogated on other grounds by State v.*

27   *Castaneda*, 245 P.3d 550, 553 n.1 (Nev. 2010). Because the Nevada Supreme Court is

28   the final arbiter of Nevada state law, its rejection of Castro's argument that Jury

                                            47

Instruction 30 was a vague description of Nevada's law prohibiting open and gross lewdness is unassailable on federal habeas review. Accordingly, it cannot be determined that Jury Instruction 30 violated Castro's due process rights. *Estelle,* 502 U.S. at 72.

### 6. Castro's proposed jury instructions

Castro argues that the state district court erred in rejecting numerous additional defense instructions.[9] (ECF No. 7 at 49.) In Castro's appeal of his judgment of conviction, the Nevada Supreme Court held:

> *Proposed Jury Instruction 3*
>
> Castro argues that the district court abused its discretion by rejecting proposed jury instruction 3 regarding two reasonable interpretations. In *Bails v. State*, this court held that "it is not error to refuse to give the instruction if the jury is properly instructed regarding reasonable doubt." 92 Nev. 95, 97, 545 P.2d 1155, 1156 (1976). Here, the jury received instructions about reasonable doubt. Furthermore, the two-reasonable-interpretations instruction is not required even when all the evidence is circumstantial in character, *id.*, and the evidence here was direct. During the jury trial, the State offered the testimony of the four victims and Castro's statement on his actions. Thus, the district court did not abuse its discretion in denying Castro's proposed instruction regarding two reasonable interpretations.
>
> *Proposed Jury Instructions 8, 9, 22-26 and 36-39*
>
> Castro contends that his proposed jury instructions accurately articulate the law and clarify the State's burden. Castro also argues that the jury instructions were not as specific as his proposed jury instructions 25-26 and 36-39.
>
> "[T]he defense has the right to have the jury instructed on its theory of the case . . . no matter how weak or incredible that evidence may be." *Margetts v. State*, 107 Nev. 616, 619, 818 P.2d 392, 394 (1991). Furthermore, "[a] positive instruction as to the elements of the crime does not justify refusing a properly worded negatively phrased 'position' or 'theory' instruction." *Brooks v. State*, 103 Nev. 611, 614, 747 P.2d 893, 895 (1987). "However, the district court may refuse a jury instruction on the defendant's theory of

---

[9]This Court notes that Castro's citations to his proposed jury instructions were difficult to follow. The unused jury instructions in Exhibit 44 (ECF No. 16-2) were not numbered, and Castro's citations were to the record on appeal at the Nevada Supreme Court.

the case which is substantially covered by other instructions." *Runion v. State*, 116 Nev. 1041, 1050, 13 P.3d 52, 58 (2000).

Proposed jury instructions 8, 9, 22, 23, 25-26, 28 and 36-39 cover the same information as jury instructions 9-13, 15, 16, 25-26, 30, 33, 34, 37-40. Furthermore, Castro fails to demonstrate how the proposed jury instructions support his "theory" or "position." Besides the negative wording, the only difference in Castro's proposed jury instructions was that each stated the State's burden of proof. However, several other jury instructions emphasize the State's burden. Thus, the district court did not abuse its discretion in rejecting Castro's proposed jury instructions.

(ECF No. 16-14 at 16–17.) These rulings were reasonable.

Castro asserts that his proposed instructions were accurate statements of Nevada state law and were not duplicative of other jury instructions outlining Nevada state law. (ECF No. 7 at 49–50.) However, again, the Nevada Supreme Court is the final arbiter of Nevada state law. Further, Castro fails to cite to any apposite constitutional decisions by the Supreme Court. Thus, it cannot be determined that the failure to include any of Castro's proposed jury instructions violated his due process rights. *Id.* at 72.

## H. Ground Four

Castro argues that cumulative errors warrants reversal of his convictions. (ECF No. 7 at 24.) In Castro's appeal of his judgment of conviction, the Nevada Supreme Court held: "Castro further argues that the cumulative error warrants reversal. As we conclude that there was no error, there can be no cumulative error warranting reversal." (ECF No. 16-14 at 4–5 n.1.) Because Castro has failed to demonstrate any errors, the Nevada Supreme Court's ruling was reasonable. Castro is denied federal habeas relief for Ground Four.

## V. CERTIFICATE OF APPEALABILITY

This is a final order adverse to Castro. As such, Rule 11 of the Rules Governing Section 2254 Cases requires this Court to issue or deny a certificate of appealability (COA). Therefore, this Court has *sua sponte* evaluated the claims within the petition for suitability for the issuance of a COA. *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d 851, 864–65 (9th Cir. 2002). Pursuant to 28 U.S.C. § 2253(c)(2), a COA may issue

only when the petitioner "has made a substantial showing of the denial of a constitutional right." With respect to claims rejected on the merits, a petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)).

Applying this standard, the Court finds that a certificate of appealability is warranted for Ground Five. Although Dr. England and Detective Jaeger testified that Castro's medication did not affect his ability to communicate, reasonable jurists could debate whether Castro had "the requisite level of comprehension" to waive his rights. *Moran*, 475 U.S. at 421. Indeed, Castro was nineteen years old and had recently suffered two gunshot wounds, which required surgery and a stay in the ICU, when the police interrogation took place. Dr. Johnson, Castro's treating physician, testified that following his review of Castro's police interrogation, he believed that Castro did not understand 20 percent of what was happening, would not have been able to give consent to a medical procedure, and sounded altered. Therefore, even if the police activity was not coercive, Castro's characteristics during the interrogation cast doubt on the admissibility of his statements. The Court declines to issue a certificate of appealability for its resolution of any procedural issues or any of Castro's habeas claims on the remaining grounds.

## VI.    CONCLUSION

It is therefore ordered that the Petition for a Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 by a Person in State Custody (ECF No. 7) is denied.

It is further ordered that Petitioner is granted a certificate of appealability for Ground Five. It is further ordered that a certificate of appealability is denied as to Petitioner's remaining grounds.

It is further ordered that under to Federal Rule of Civil Procedure 25(d), the Clerk of Court is directed to substitute Renee Baker for Dwight Neven as the respondent warden on the docket for this case.

///

The Clerk of Court is directed to enter judgment accordingly and close this case.

DATED THIS 6th day of February 2020.

_____
MIRANDA M. DU
CHIEF UNITED STATES DISTRICT JUDGE